UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA TAYLOR, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE, INC.,<br><br>    Defendant. | Case No. 20-cv-03906-RS<br><br>**ORDER GRANTING MOTION TO DISMISS** |

## I. INTRODUCTION

Plaintiffs in this putative class action seek to hold Apple liable for distributing certain game apps through the Apple App Store that they allege include features legally equivalent to slot machines, as defined and prohibited by California law. Apple seeks dismissal on several grounds. For the reasons explained below, the motion will be granted, with leave to amend.

## II. BACKGROUND

The named plaintiffs in this case are Rebecca Taylor and her minor son, C.T. Since at least 2019, C.T. has owned and played Brawl Stars, a game developed, owned, and sold by Supercell. C.T. downloaded Brawl Stars from the App Store onto both iPad and iPhone devices. In the course of playing Brawl Stars, C.T. allegedly has been "induced" to spend money to make "in-game" purchases of so-called "loot boxes." To make such purchases, a player selects an option that will take him or her to an App Store screen, which will show the game, the player's App Store account

identifier, and confirm the player wants to purchase the item by requiring him or her to press the "purchase" button.

When the "purchase" button is pressed, the player is prompted to enter his or her Apple account password. The purchase is then immediately charged to the credit card number on file. A minor can make purchases without parental consent, or even parental knowledge. Alternatively, payment can be made with iTunes gift cards.

Taylor estimates C.T. has spent at least $25 on in-game loot boxes. C.T. used his own money in the form of iTunes gift cards he had received, and his parents' credit card, which is on file with the App Store.

Loot boxes are simply randomized chances within the game to obtain important or better weapons, costumes, or player appearance (called "skins"), or other in-game items or features that are designed to enhance gameplay. Buying a loot box is a gamble in the sense that the player does not know what it actually contains until it is opened. The opportunity to find and open loot boxes typically also can be earned through game play itself, without any purchases.

Players do not purchase loot boxes directly. Rather, they buy a form of "virtual currency" specific to each game that can be used to acquire virtual items within the game—including, but not necessarily limited to, loot boxes. In the case of Brawl Stars, the virtual currency is called "Gems." Small amounts of Gems can be earned through game play. A player can buy a "fistful of Gems"—30 Gems—for $1.99.  A "pouch" of 80 gems costs $4.99, and a "crate full" of 950 Gems runs $49.99.

Loot boxes, in turn, also come in varying sizes and prices. A "Big Box" is the equivalent of 3 "Brawl Boxes," and costs 30 Gems. Mega Boxes cost 80 Gems each and are the equivalent of 10 regular Brawl Boxes.

Loot Boxes can contain numerous items, and the contents are ranked by order of probability with terms such as: "Common," "Rare," "Epic," and "Legendary." According to App Store Guidelines, each game developer must publish the odds of winning a desirable item in any given loot box. Especially rare loot box items often come with long odds. For example, a

"Legendary" Brawler in Brawl Stars has approximately 0.3% probability of appearing in any particular "Brawl Box." Thus, a player intent on obtaining a "Legendary" Brawler could easily spend more than $100 before drawing one, based on the probabilities.

The complaint alleges in extensive detail how various visual and sound features of loot boxes in the game are purportedly designed to "exploit and manipulate the addictive nature of human psychology" just as slot machines and other forms of gambling do. Plaintiffs cite various reports specifically identifying loot boxes as potentially harmful, especially to children. Plaintiffs assert various efforts to ban them are underway in Europe and elsewhere. Despite the focus on children in many of the allegations, the proposed class is not age limited. Nor is the class limited to Brawl Stars players, although that is the only game C.T. is alleged to have downloaded and played.

The games at issue typically are available for download for free or at very little cost. The game developers and Apple profit through the sales of the virtual currencies. Apple allegedly collects the money, deducts a 30% commission, and forwards the balance to the developers.

The complaint advances three claims for relief: violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and a purported stand-alone claim under common law for "unjust enrichment."

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard asks for "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Id.* at 1242 (internal quotation marks and citation omitted). When evaluating such a motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).

## IV. DISCUSSION

A. <u>Communications Decency Act—Section 230</u>

Apple contends the Communications Decency Act ("CDA"), 47 U.S.C. § 230, bars plaintiffs' claims, and that the entire complaint should be dismissed on that ground. Section 230(c)(1) provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[1]

Under the CDA, an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such

---

[1] Section 230(c)(2) states that providers or users of an interactive computer service are not liable for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected . . . ." Here, it does not appear Apple is relying on (c)(2) or that it could do so. While (c)(2) is the heart of section 230 and reflects the primary issue the statute was adopted to address, this simply is not a case where Apple is facing a claim for having "censored" third-party content on its platform. Apple instead is invoking (c)(1), and contends plaintiffs are improperly attempting to hold it liable as the "publisher or speaker" of "information provided by another information content provider."

systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

Congress enacted these provisions "for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). "In light of these concerns, reviewing courts have treated § 230(c) immunity as quite robust, adopting a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.' Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue." *Id*. at 1123 (footnotes omitted).

Nevertheless, neither section 230(c) nor any other subsection in the CDA "declares a general immunity from liability deriving from third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009). Instead, to determine whether section 230(c)(1) operates as a bar to civil liability, courts must determine whether "a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content." *Id*. at 1101.

> "[W]hat matters is not the name of the cause of action—defamation versus negligence versus intentional infliction of emotional distress—what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another. To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability."

*Id*. at 1101–02.

*Barnes* further explains that "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id*. at 1102. "[A] publisher reviews material submitted for publication, perhaps edits it for style or technical fluency,

and then decides whether to publish it." *Id*.

By contrast, the CDA does not bar claims against "information content providers." An entity "that is responsible, in whole or in part, for the creation or development" of the allegedly offending information is not entitled to the CDA's protection. "Development" refers "not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1167–68 (9th Cir.2008).

Here, plaintiffs labor to show that Apple fits into the category of an "information content provider" because of the involvement it has with the app developers, including by requiring developers to disclose loot box odds, and by handling the financial transactions with customers. Standing alone, those arguments likely would be insufficient to exempt plaintiffs' claims from the scope of section 230 protection.

Plaintiffs also present a simpler and dispositive argument, however, that Apple's alleged liability in this case simply does not turn on it being "treated as the publisher or speaker of any information." Apple is not charged with disseminating information where doing so might ordinarily be actionable under one legal theory or another, but is shielded under section 230. Plaintiffs' theory is that Apple is distributing games that are effectively slot machines—illegal under the California Penal Code. While the viability of that claim is discussed further below, for purposes of evaluating the applicability of section 230, it is irrelevant whether or not the games actually violate the law. Plaintiffs are seeking to hold Apple liable for selling allegedly illegal gaming devices, not for publishing or speaking information.

*HomeAway.com v. Santa Monica*, 918 F.3d 676 (9th Cir. 2018) is instructive. There the issue was whether a municipality could regulate short-term rentals by Airbnb and a similar internet-based rental service. *Id.* at 679. The rental services argued section 230 precluded the City from requiring them to monitor listings posted on their websites for rentals that did not comply with the ordinance. *Id.* at 681. The court held the ordinance did not proscribe what the rental companies could or could not allow to be posted on their website, but only the companies own

conduct in handling rental bookings—which had to comply with the terms of the ordinance. *Id.* at 682. In other words, section 230 applies to information and internet content, but does not otherwise insulate unlawful activity or transactions.

*Barnes* reflects a similar distinction. The plaintiff sought to hold Yahoo! liable for failing to remove defamatory material her ex-boyfriend had posted about her. 570 F.3d at 1098. The court held section 230 barred a claim under Oregon law that attempted to hold Yahoo! liable for negligently failing to remove the material, *id.* at 1105, but did not bar an independent claim for promissory estoppel—which was not premised on Yahoo! being treated as a "publisher" of the material. *Id.* at 1109.

While the circumstances here are not identical to those in either *HomeAway.com* or *Barnes*, the principle is the same. Section 230 can bar liability based merely on dissemination of information, but it is not a license to engage in unlawful conduct. If, hypothetically, an internet retail site allowed third-party sellers to post listings for illegal narcotics, section 230 would protect it from any liability arising merely from the listing appearing on the website. If the retailer then accepted orders, took payment, and processed the orders for the third parties (as such sites sometimes do for third-party sellers), however, section 230 surely would not insulate the retailer from drug dealing charges.

Similarly, section 230 might be a defense for Apple were some plaintiff or regulator attempting to hold it liable merely for *listing* for sale games that arguably meet the definition of slot machines. The claim here, however, does not attempt to impose liability on Apple as a "publisher or speaker," and section 230 does not provide a basis for dismissal.

### B. Standing

Apple contends plaintiffs lack standing under the UCL because they have alleged no cognizable economic injury resulting from Apple's conduct. Apple is correct. California law is clear that UCL standing requires the plaintiff suffer "economic injury." *Kwikset Corp. v. Sup. Ct. (Benson)*, 51 Cal. 4th 310, 322–23 (2011); *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir.

2013). All C.T. purchased from Apple was virtual currency. He obtained exactly what he paid for—virtual currency that he was free to use as he wished in the game. C.T. had the opportunity to use it to purchase virtual items within the game other than loot boxes. He also had the choice to use it to purchase loot boxes, for whatever benefits he perceived that provided him.

Plaintiffs' counter-argument is that virtual currency is equivalent to gambling chips sold in a casino. The fatal flaw in that analogy, however, is that gambling chips are freely convertible back into cash. Virtual currency is not. Although plaintiffs vaguely allege there are some "grey markets" for trading valuable virtual items obtained in some games, it appears players at most sell entire accounts, not individual items. Moreover, the Ninth Circuit has rejected the notion that sales in such markets, in violation of a game's terms of use, support a claim that virtual currency is a "thing of value." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.2 (9th Cir. 2018). In any event, virtual currency is fundamentally different from real world gambling chips.

Even if the analogy were more apt, it would not translate into a cognizable claim of economic injury against Apple here. C.T. bought the "chips" from Apple, but lost the "chips" when he chose to purchase loot boxes inside the virtual world of the game. That was not a transaction with Apple.

Although not controlling, *Mason v. Mach. Zone, Inc.*, 140 F. Supp. 3d 457 (D. Md. 2015), which also involved a game of chance within a video game is on point and persuasive.[2] The game

---

[2] Plaintiffs contend the Ninth Circuit was critical of *Mason* in *Kater*. Not so. Indeed, *Kater* cited *Mason* approvingly for the proposition that trading markets for virtual currency that violate a game's terms of service do not make the currency a "thing of value." *Kater*, 886 F.3d at 788 n.2. *Kater* then *distinguished,* but did not criticize, *Mason* on a separate point, based on a difference in the respective Washington and Maryland statutes applied in the two cases. As to that separate point, *Kater* concluded a player in a virtual casino (not one within a larger game) could recover under a Washington statute for alleged losses in virtual "chips" because those chips were required to extend gameplay. Here, in contrast, continued gameplay does *not* require virtual currency or items obtained from loot boxes, the Washington statute is not applicable, and the relevant California statute expressly *excludes* from the definition of slot machines "amusement machines or devices, which are predominantly games of skill, whether affording the opportunity of additional chances or free plays or not." California Penal Code section 330b(f).

in *Mason* included a feature that emulated a casino where, as here, the "gambling" was carried out with "virtual" currency. The plaintiff insisted she had suffered an economic injury by "wagering" in the casino, losing $100 at typically 60 cents per "spin." The court rejected the argument:

> But of course Plaintiff was not wagering with *dollars* ; she was playing with *virtual gold*. Plaintiff acquired that "gold" in the "gold store," where she exchanged her real-world currency for a nontransferable, revocable license to use virtual currency for entertainment purposes . . . . At the moment of that antecedent transaction, Plaintiff's "loss," if any, was complete: then and there she had swapped something of value (real money) for something of whimsy (pretend "gold").
>
> Plaintiff could spend her "gold" as she pleased within the bounds of Defendant's [Terms of Service]: she could acquire resources to "hasten [her] advancement in the game", or she could exchange her "gold" for chips to spin the Casino wheel . . . . What she could not do is cash out of the game.

*Id*. at 465-66 (emphasis in original, footnote omitted).

The *Mason* court further observed that while the casino function in the game "aesthetically resembles classic games of chance, the underlying transaction is more akin to purchasing cinema or amusement park tickets. Consumers of such services pay for the pleasure of entertainment per se, not for the prospect of economic gain." *Id.* The same applies here. Plaintiffs' insistence that the loot boxes are designed to incorporate flashing lights, sounds, and other features reminiscent of actual slot machines does not support a conclusion that players buy virtual currency (with which they then sometimes buy loot boxes) for the prospect of economic gain.

There is no dispute that if the UCL claim fails for lack of standing so too does the CLRA claim and the "unjust enrichment" claim. Accordingly, dismissal of the entire complaint is warranted.

C. Merits

Even if plaintiffs had alleged a sufficient economic injury to support standing, dismissal would still be warranted for failure to state a claim. Although plaintiffs invoke in passing a federal

gambling statute (which incorporates state law), there is no dispute that their claims all turn on whether they can show the loot boxes effectively make the games "slot machines" in violation of California Penal Code sections 330a, 330b and 330.1.

California Penal Code section 330b(d) defines a "slot machine or device" as one that:

> (1) is operated by the result of the insertion of any piece of money or coin or other object, or by any other means,
>
> (2) utilizes any element of hazard or chance or of other outcome of operation unpredictable by the user,
>
> (3) by such hazard, chance, or unpredictable outcome may entitle the user to receive money, credit, or "a thing of value," including an additional chance to use the slot machine or device, regardless of whether it also provides, "merchandise, indication of weight, entertainment, or other thing of value" independent of thing of value provided by chance.

Section 330b(f) narrows this definition, expressly carving out games that require skill: "Pinball and other amusement machines or devices, which are predominantly games of skill, whether affording the opportunity of additional chances or free plays or not, are not included within the term slot machine or device, as defined in this section."

Plaintiffs do not contend it is premature to conclude at the pleading stage that the games at issue are predominately games of skill; they effectively concede as much. Instead, they argue the loot boxes should be evaluated independently from the games as a whole. *Mason* rejected the same argument.

> Here, Defendant argues, "Plaintiff's pleading and indisputable facts show that there is no dispute that GoW, as a whole, is a game of skill, not chance." . . . Plaintiff does not refute this point directly; instead, she complains that "[u]nder Defendant's logic, any game of chance normally violating § 330b . . . can be transformed into a legal game by surrounding it with games of skill."
>
> Defendant's logic would lead to no such result. The game at issue here is not "Casino"; the game is GoW. Plaintiff proffers no authority for the proposition that the Court may excise one particular aspect of an integrated strategy game and evaluate that aspect in isolation. On the contrary, applying Plaintiff's logic, one could excise the free replay and similar chance-based functions of any

> number of skill-based games—including pinball—and, viewing those aspects in isolation, find the games to violate section 330b. In essence, Plaintiff invites the Court to read the subsection (f) exclusion out of the statute. The Court declines Plaintiff's invitation.

140 F. Supp. 3d at 463.

Finally, the allegations of the complaint further fail to show that the games violate the Penal Code because the loot boxes do not offer players a chance to win "a thing of value." Plaintiffs insist that the loot boxes contain items that are of significant subjective value to those who play the games and purchase them. While that undoubtedly is true, the lack of any real-world transferable value to the items takes them outside the meaning of the statute.[3]

## V. CONCLUSION

The motion to dismiss is granted. Although it is unclear how additional or different allegations could remedy the identified defects, leave to amend will be granted. Any amended complaint shall be filed within 20 days of the date of this order.

**IT IS SO ORDERED**.

Dated: March 19, 2021

_____
RICHARD SEEBORG
Chief United States District Judge

---

[3] Apple repeatedly asserts that no case has ever found game developers themselves liable for loot boxes. Plaintiffs do not dispute those assertions. While it is not necessarily dispositive absent cases expressly finding developers not liable, it is of some import that if no game developer has faced liability, there is even less reason that Apple, one step removed, should be liable.